IN RE THE ST. LOUIS INSTITUTE OF CHRISTIAN SCIENCE.

**St. Louis Court of Appeals, November 8, 1887.**

1. CORPORATIONS, RELIGIOUS.—A corporation whose charter powers are to be used in aid of the propagation and practice of a religious belief, is a religious corporation, and is within the constitutional prohibition.

2. —— BENEVOLENT—PECUNIARY PROFITS.—A corporation, the expenditure of whose earnings is placed exclusively within the discretion of its board of directors, and whose residual fund is used in compensating the members of the board for their services, is not a benevolent corporation.

3. —— AMICUS CURIAE—COMPENSATION—COSTS.—An *amicus curiæ* to whom articles of a proposed corporation are referred for examination and report, may be allowed a reasonable compensation therefor, to be taxed as costs against the proposed incorporators.

APPEAL from the St. Louis Circuit Court, DANIEL DILLON, Judge.

*Affirmed.*

Pattison & Crane, for the appellants: The proposed corporation is not a religious corporation within the purview of the constitution. *Baptist Church v. Witherell,* 3 Paige, 301; *Weld v. May,* 9 Cush. 188; *Ex parte Andrews,* 18 Cal. 684. The corporation is not one for pecuniary profit. *Sheren v. Mendenhall,* 23 Minn. 92; *Gooch v. Association,* 109 Mass. 567; *McDonald v. Hospital,* 120 Mass. 432; *American Asylum v. Bank,* 10 Am. Dec. 112. The allowance of a fee to the *amicus curiæ,* to be taxed as costs, was unwarranted by law. Rev. Stat., sect. 1010; *Steele v. Wear,* 54 Mo. 531; *Shed v. Railroad,* 67 Mo. 687; *In re Murphy,* 22 Mo. App. 476.

Charles Claflin Allen, *amicus curiæ:* The proposed incorporation is *sui generis.* It embodies certain religious features blended with a vocation for "pecuniary profit." The allegations as to its purpose are too vague. Rev. Stat., sect. 970. It can not be incorporated as a religious organization. Const. of Mo., art. 2, sect. 8; *Catholic Church v. Tobbein,* 82 Mo. 418. The purposes disclosed include the prosecution of a business for "pecuniary profit." As such it can not be incorporated. Rev. Stat., chap. 21, art. 10, sects. 970, 974, 978; Boone on Corporations, sect. 339; *The People v. Nelson,* 46 N. Y. 477; *Sheren v. Mendenhall,* 23 Minn. 92. The purposes disclosed indicate none of the characteristics requisite to constitute a benevolent, charitable, or literary corporation within the meaning of article 10. As indicating how jealously the legislature guards the benevolent feature of article 10, see amendment to sect. 978, Acts of 1883, p. 53; amendment to sect. 982, Acts of 1887, p. 115; see, also, original sect. 982, Rev. Stat. 1879. *Expressio unius, exclusio alterius.* As to what constitutes charitable or benevolent corporations, see 1

Blackstone's Com., p. 471, chap. 18; 1 Kyd. on Corp. 27; 2 Kent's Com. 274; Field on Corp., sect. 2; Potter on Corp., sect. 19; Angell and Ames on Corp., sect. 39; Morawetz on Corp., sect. 4; 43 Eliz. chap. 4; 7 Stat. at Large 43; *Maine Baptist Missionary Convention v. Portland*, 65 Me. 92; *The People v. Nelson*, 46 N. Y. 477; s. c., special term Sup. Ct. N. Y.; 3 Lansing, 394; 10 Abb. Pr. (N. S.) 200; *American Asylum v. Phoenix Bank*, 4 Conn. 172; *Regents v. Williams*, 9 Gill & Johnson [Md.] 365; *Gooch v. Association*, 109 Mass. 558; *McDonald v. Hospital*, 120 Mass. 432; *Sheren v. Mendenhall*, 23 Minn. 92; *Queen v. Pocock*, 8 Ad. and Ellis (N. S.) 729. The *amicus curiæ* is an officer provided for by statute (sect. 971, and Acts 1885, p. 98); his status is analogous to that of commissioner in an assignment, or to take depositions, and he is entitled to reasonable compensation.

LEWIS, P. J., delivered the opinion of the court.

Application was made to the circuit court by Janet T. Colman, Jonas M. Hampson, and Erwin L. Colman for a *pro-forma* decree of incorporation, under article 10 of chapter 21, of the Revised Statutes. The intended corporation was to be named, "The St. Louis Institute of Christian Science," and a copy of its constitution accompanying the petition contained the following provisions:

"Article III. The object of said institute shall be:

"1. To teach a higher sense of the moral and spiritual qualifications requisite for harmony and health, thereby elevating mankind mentally, morally, and physically.

"2. To establish and maintain a school or institute for instruction in Christian science or metaphysics, and its application to heal the sick and promote longevity, as taught by the Massachusetts Metaphysical College, Boston, Mass.

"3. To establish and maintain a sanitarium for the

treatment and healing of disease, as taught at said college.

"Article IV. The tuition fees charged to pupils in the school, and the amounts paid by patients in the sanitarium, shall be devoted, first, to the payment of the necessary and proper expenses of the said school and sanitarium, including salaries of the professors and teachers in the school, and fees and wages to the professional and other attendants in the sanitarium; second, such receipts as are not needed for the above purposes shall be devoted to the furtherance of the principles taught in the said school, in such way as to the board of directors shall seem best."

Article V. provides that the board of directors shall consist of a president, secretary, and treasurer, and such other members as shall be provided in the by-laws, not to exceed thirteen in number. Article VI. provides that the three petitioners, in the order named, shall constitute, respectively, the president, secretary, and treasurer of the Association for the first year. Article VII. provides that the corporation may make by-laws, and may at any time determine by its by-laws the conditions of membership therein.

The court appointed Charles Claflin Allen, Esq., to be *amicus curiae*, to examine the amended petition and to show cause, if any there be, why the prayer of the petitioners should not be granted. The *amicus curiæ* afterwards reported his examination, and recommended that the application be denied, because: (1) The decree asked for would be an attempt to create a religious corporation, in violation of section 8, article 2, of the state constitution; and (2) it would erect a business corporation "for pecuniary profit," contrary to section 978 and other sections of the Revised Statutes. Exceptions were filed to the report and recommendation, but the court sustained the views of the *amicus curiæ* and denied the application.

The question, What is a religious corporation?

within the meaning of our constitution, is of rather difficult solution, and one upon which we have no direct judicial light. The constitutional provision in question declares: "That no religious corporation can be established in this state, except such as may be created under a general law for the purpose only of holding the title to such real estate as may be prescribed by law for church edifices, parsonages, and cemeteries." It appears to be implied in this language that a corporation created for the purpose of holding the title to a church edifice, parsonage, or cemetery, would be a religious corporation, and within the exceptions expressed in a prohibition of the generic class to which it belongs. A church edifice is understood to be a building in which people assemble for the worship of God, and for the administration of such offices and services as pertain to that worship. A parsonage is intended for the accommodation of the leader and teacher in such worship, and a cemetery in connection with a church is designed, primarily, for the burial of its worshipers and members. Thus we see that a religious corporation within the constitutional meaning is not necessarily a church, in the common acceptation of the term, or even a "religious society," as defined by judicial writers. In *Baptist Church v. Witherell* (3 Paige, 301), a religious society is said to be "a voluntary association of individuals and families united for the purpose of having a common place of worship, and to provide a proper teacher to instruct them in religious doctrines and duties, and to administer the ordinances of baptism," etc. But it is impossible to consider our constitution as requiring that all these elements and conditions shall enter into the composition of a "religious corporation," in order to bring it within the constitutional inhibition. It plainly intends to forbid the creation of any corporation (other than those which are expressly excepted) whose purposes are directly and manifestly ancillary to divine worship or religious teaching. This does not mean that

a corporation, created for educational or benevolent purposes, may not hold prayers or impart religious instruction to its pupils and votaries, without a forfeiture of its charter, or a violation of the law. A distinction must be observed, between what the members or servants of a corporation may lawfully do, as not being forbidden by any moral or civil precept, and such things as inhere in the declared purposes and objects for which the corporation was created. " The leading purpose of an association is the purpose which determines its character." *Sheren v. Mendenhall*, 23 Minn. 93. The constitutional provision under consideration does not, in any degree, abridge religious freedom ; but, on the contrary, secures its universality by withholding special powers and privileges from any one denomination of religionists, or its adjuncts and coadjutors.

At the hearing of the exceptions, Mrs. Colman, the intended president of the proposed corporation, testified as a witness to the purposes and objects of the association, and it was agreed that Erwin L. Colman, her husband, was to be the treasurer, and that his testimony, if sworn, would be to the same effect as that of his wife. We append some statements of the witness, which may fairly be considered, in connection with the constitution of the association, as elucidating the character of the proposed corporation.

After the witness had stated that a part of the income of the institute was to be devoted to the support of a church, located in the city of Boston, the examination proceeded thus :

"Q. It seems that the object of the church is for mind healing. Does that take the form of a religious belief ? A. It is to get pure thoughts in the minds of the people."

" Q. Is it in the form of a religious belief ? A. It certainly is."

" Q. Does it relate to the body here, or to a hereafter ? A. Why, both to time and eternity."

"Q. What I want to know is whether that church does undertake to teach a form of religious belief? A. Of course it does. It would not be a church, if it did not."

"Q. I understand that the petitioners and others, of like belief, are believers in the Bible, and followers of Jesus Christ. As such, they hold to a form of belief that mind is supreme; that is, that there is only one great mind, which is the divine mind, and that mind is over all, and in all, and through all; that that mind is the spirit of God. And, as I understand, believe that they have a power similar to that which the immediate disciples of Christ had in his day, of healing by what is commonly called miraculous power. That is what you call the power of mind? A. If we live up to it. That we may have this power by living it."

"Q. I want to know if that is the doctrine of your church; if that is one of the doctrines of your belief, that by living up to this standard, you can heal? A. That is the church doctrine and our profession and lives."

"Q. That is, if you live up to the doctrine of your church, you can heal the way the apostles did? A. Yes, sir."

If we compare these statements with the constitution of the proposed "Institute," and consider all together, it is impossible to resist the conclusion that the petitioners are asking for the powers of a corporation, that they may be used in aid of the propagation and practice of a religious belief and rule of human conduct. It is by these means only, that the proposed corporation is, in the language of its constitution, "To teach a higher sense of the moral and spiritual qualifications requisite for harmony and health, thereby elevating mankind mentally, morally, and physically." Reference is made to the "Massachusetts Metaphysical College, Boston, Massachusetts," as the model which

the proposed corporation is to copy in its teachings and practice. We are not informed of the character and purposes of that college, except as these may be understood from the explanations given in evidence by two of the three petitioners. It is not unreasonable to assume that these explanations are a reflex of the methods and purposes of the Boston model. In this view, our understanding of the purposes of the proposed corporation may be traced to the face of its constitution, as well as to the oral testimony.

The leading purpose of the intended corporation is, the healing of physical and mental diseases. But all the healing is to be accomplished by the supposed efficacy of a religious tenet. Take away the religious agency, and there is literally nothing left, whereby the corporation may effect its purposes. Religion is its motive power, and quite as essential to all its work, as is money to a banking corporation, or a railway, cars, and locomotives to a railway company. If this does not make it a religious corporation within the constitutional meaning, then nothing short of a church regularly ordained for public worship can come within the constitutional intent. We find no error in the circuit court's refusal of the decree asked for, on the ground that it would be an attempt to create a religious corporation.

The other ground of refusal was no less proper. By section 978, of the Revised Statutes, it is directed that "No association, society, or company, formed * * * for pecuniary profit in any form * * * shall be incorporated under this article." The constitution of the institute provides that, after the payment of certain expenses out of the tuition fees charged to pupils and the amounts paid by patients, the remainder of such receipts "shall be devoted to the furtherance of the *principles* taught in the said school, in such way as to the board of directors shall seem best." This opens as wide a field for unrestricted appropriation and expenditure by the petitioners (who constitute the board of directors)

as may be found in any corporation established purely for the pecuniary profit of its founders. The residual expenditure is to be, not for the support or advancement of the institute itself, but for the furtherance of its "principles," in whatever way the directors—*i. e.*, the petitioners, who are to be sole judges thereof—may choose to adopt. The directors may be of opinion that the principles of the institute will be best furthered by their own personal comfort and exemption from the crying wants of life. There is hardly any limit to the number of ways in which the personal advantage of the directors may be considered by themselves, as in furtherance of the "principles" taught by the institute. The residual fund is, practically, as much under their entire personal control, as if the constitution had plainly declared that such was the special object in view. To this extent, the corporation would be created for the pecuniary profit of its founders, and, therefore, contrary to the letter of the law.

Objection is made that the court erred in its allowance of fifty dollars to the *amicus curiæ*, to be taxed as costs. There is no express statutory direction for such an allowance, but it falls within a class of obvious demands which a court, in the exercise of its general powers, may properly impose upon the losing party. There is no statutory authority for the allowance of fees to a commissioner for taking depositions, or to a statutory assignee for the benefit of creditors, yet the power of the courts to allow reasonable fees to those officers, as costs in the proceeding, has never been seriously questioned. The *amicus curiæ* in a case like the present is an officer of the court, appointed under authority of law, to aid the court by the performance of certain labors and examinations which are necessary to guide the court to a proper conclusion upon the application before it. In many cases, doubtless, the work of the officer is of comparatively small extent, and com-

pensation is not asked for it.  But it is not, therefore, to be supposed that in every case of this class, whatever be the amount or difficulty of the examination and other work performed, all must be done without remuneration.  "The laborer is worthy of his hire."  And it is not unreasonable to put the cost of his hire upon the party who set on foot the proceeding that made it necessary.  The authorities cited for the petitioners are not in point.  They are cases wherein certain statutes are construed which fix the amounts of fees in particular matters.  They have no reference to the power of a court to allow a reasonable sum for services rendered, where no statute fixes any amount.  It is not claimed that the amount allowed in this case for the service rendered is unreasonable.  *Kelley v. Andrew County*, 43 Mo. 342.

All the judges concurring, the judgment is affirmed.